UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Chapter 7 Case |
| Terrilynn T. Vu, | BKY 12-46862 |
| Debtor. | |

### MEMORANDUM OPINION AND ORDER

At Minneapolis, Minnesota on September 30, 2013.

An evidentiary hearing regarding the trustee's motion objecting to exempt property came on for hearing on August 23, 2013.

Michael Iannacone appeared on behalf of the debtor. Jacqueline Williams and Timothy Pramas appeared on behalf of the chapter 7 trustee, Nauni Jo Manty.

This court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 157, Bankruptcy Rule 4003, and Local Rules 4003-1, 9006-1, and 9013-1. Matters concerning the allowance or disallowance of exemptions are core proceedings under 28 U.S.C. § 157(b)(2)(B).

The court took the case under advisement. The court sustains the trustee's objection for the reasons stated below.

### FINDINGS OF FACTS

After carefully listening to the testimony and reviewing all evidence in the record, the court makes the following findings of fact:

1. Currently, the debtor is employed as a comptroller at Gold Coast Baking Company, where she has been employed for nine years. The debtor graduated from California

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on 09/30/2013
Lori Vosejpka, Clerk, by LH

1

State University, Long Beach with a degree in business administration and accounting/finance. She has worked as an accountant and a financial analyst for over 20 years.

2. On March 20, 2003, while living in California, the debtor and other family members executed two notes, totaling $920,000, in favor of First Financial Bank, a lender for the United States Small Business Administration ("SBA"), in order for her brother and sister-in-law to purchase a chicken farm property located in Scott County, Mississippi. On November 16, 2006, the chicken farm was transferred to the debtor's nephew and the debtor personally guaranteed her nephew's indebtedness under a third note with First Financial Bank for $189,751. The parties defaulted on all three loans and First Financial Bank foreclosed on the property. There was a deficiency balance of $219,241.28.

3. The debtor moved from California to Minnesota in the summer of 2007. She moved into a house located at 8830 Birchwood Lane, Bloomington, Hennepin County, Minnesota. The house was owned by her boyfriend, Mark Saliterman. The debtor and Mark Saliterman had been friends since 2006 and became romantically involved in the summer of 2007. Mr. Saliterman purchased the Birchwood Lane house in the early 2000s for approximately $300,000, but has never lived there.

4. Before moving into the Birchwood Lane house, the debtor and Mr. Saliterman agreed that the house would be renovated and that the debtor would pay Mr. Saliterman $115,000 for the renovations. The debtor executed a Promissory Note, dated June 1, 2007, in which she agreed to pay Mr. Saliterman $115,000 by June 30, 2009, in four installments. The schedule of payments was as follows: (1) $25,000 due in February

2009; (2) $25,000 due in March 2009; (3) $20,000 due in April 2009; and (4) $45,000 due in May 2009. The debtor testified that she intended to pay off the note when her house in California sold, which it did in the fall of 2007.

5. The debtor did not make the payments according to the schedule. Rather, the debtor wrote a check to Mr. Saliterman for $45,000 on May 1, 2009,[1] and testified that she paid the remaining $70,000 in cash. While bank records show cash withdrawals in March and April, 2009, the parties did not know when the cash payments to Mr. Saliterman were made. The amounts in the aggregate do not match the amount owed to him. There are no documents corroborating the testimony that the debtor paid Mr. Saliterman in cash.

6. The debtor and Mr. Saliterman testified that the payments on the $115,000 loan represented the debtor's rent for living at the house. The debtor made no regular rent payments to Mr. Saliterman. She paid no security deposit to Mr. Saliterman. There was no lease. Mr. Saliterman did not report any payments on his tax returns as rental income or otherwise. The payments were not for rent but were for renovations.

7. The debtor received a demand and garnishment letter from the SBA regarding her guaranty for the loans with First Financial Bank in late August 2012. The debtor stated that she did not contact the SBA at any time. She had no intention of paying the SBA as she had not received the money from the loan.

---

[1] Although the debtor wrote the $45,000 check on May 1, 2009, she did not have sufficient funds in her checking account at the time to support the check, although she did have sufficient funds in savings. On July 22, 2009, the debtor transferred $45,000 from her savings account to her checking account. The next day, Mr. Saliterman deposited the $45,000 check. There was no explanation as to why the check was not cashed until late July.

8. The debtor and Mr. Saliterman testified that they had agreed that the debtor would buy the Birchwood Lane house in July 2012 because she had expressed an interest in owning it many times.

9. On September 26, 2012, the debtor: (1) sold her 2011 Acura MDX to Wayzata Nissan for $40,000 (which was unencumbered); (2) paid Mr. Saliterman $80,000 as a down payment for the house; (3) executed a contract for deed for the Birchwood Lane house for $301,500; and (4) executed an option to re-purchase the Birchwood Lane house. The money from the sale of her car was part of the down payment. The remainder of the down payment came from the debtor's bank accounts.

10. An amendment to the contract for deed was executed on October 1, 2012. Pursuant to the amendment, the debtor increased her down payment to $81,000 and the remaining balance of $220,500 was payable over a 15-year term with interest at 3% for the first five years and 6% over the next ten years.

11. After purchasing the house, the debtor had almost nothing left in her bank accounts. At the time she filed her bankruptcy petition, the debtor scheduled the balance of her three bank accounts as totaling $3,935.

12. Mr. Saliterman is an owner of Wayzata Nissan. He is also an owner of Shakopee Chevrolet. After the sale of the debtor's car to Wayzata Nissan, Shakopee Chevrolet gave her a car to use free of charge. She continues to use the car and testified that she now pays for the car each month. The schedules do not list a lease or an agreement for the use of the vehicle. The schedules also do not show ownership of the car. The schedules show that the debtor does not pay for auto insurance.

13. In the option agreement executed on September 26, 2012, the debtor granted Mr. Saliterman the "exclusive right and option to purchase the Property located at 8830 Birchwood Lane . . . for the amount, negotiated by [Mr. Saliterman] and [the debtor], not to exceed $301,500.00 (a) plus 50% of the interest paid by [Mr. Saliterman] under the Contract through the closing date (b) less the principal balance under the Contract owed by [the debtor] to [Mr. Saliterman]." Mr. Saliterman's exclusive right to repurchase the house continues as long as the debtor owns it, including after the time the contract for deed is paid in full.

14. The debtor testified that she filed her bankruptcy petition on December 6, 2012, because of her obligation to the SBA. Because she did not receive the money from the loans, she did not feel that she should have to pay the SBA, even though she admits to guarantying the loan. At the time the debtor filed for bankruptcy, her sole unsecured debt was owed to the SBA and her sole secured debt was for the contract for deed owed to Mark Saliterman.

15. The debtor elected to use the Minnesota state exemptions and claimed a homestead exemption of $390,000 under Minn. Stat. §§ 510.01 and 510.02 for the Birchwood Lane house.

16. The debtor lists three different valuations for the Birchwood Lane house: (1) on schedule A and C, the value is listed as $301,500; (2) also on schedules A and C, the debtor lists the "county valuation" as $387,300; and (3) on schedule C, the debtor lists the value of the claimed homestead exemption as $390,000.

17. The debtor did not testify about any prepetition bankruptcy exemption planning.

18. The debtor did not disclose her relationship with Mr. Saliterman in the schedules as required. She referred to him as her "landlord" throughout the Section 341 meeting. The trustee did not learn about the relationship until the debtor's deposition was taken several months after the Section 341 meeting.

19. The debtor's bank statements show transfers to two nieces that were not disclosed in her schedules or at the Section 341 meeting.

20. The trustee filed an objection to the debtor's homestead exemption on May 7, 2013. The debtor responded timely.

## MEMORANDUM

The issue here is whether the court should sustain the trustee's objection to the debtor's homestead exemption because the debtor intended to hinder, delay, or defraud her creditor when she transferred almost all of her non-exempt property into exempt property. The objection is sustained because the court is convinced that the debtor intended to hinder, delay, or defraud.

As the objecting party, the trustee has the burden of proving that the homestead exemption was not properly claimed because the debtor violated Minnesota's Uniform Fraudulent Transfer Act and 11 U.S.C. § 522(o). Fed. R. Bankr. P. 4003(c).

Under Minnesota's enactment of the Uniform Fraudulent Transfer Act, Minn. Stat. § 513.44, a debtor may not claim an exemption in property obtained through a transfer made by the debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor." Additionally, under 11 U.S.C. § 522(o), the amount of an exemption of a state homestead "is reduced to the extent that the value of the exemption is attributable to nonexempt property that the debtor converted into the homestead, if the conversion was made 'with the intent to hinder, delay or defraud a creditor.'" *In re Addison*, 540 F.3d 805, 809 (8th Cir. 2008).

Because direct evidence of fraudulent intent is generally not available, the court may infer such intent from badges of fraud and the circumstances surrounding the transfer. *Id.* at 811-12; *see also In re Maronde*, 332 B.R. 593, 600 (Bankr. D. Minn. 2005) (citing *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1353 (8th Cir. 1995)). Pursuant to Minn. Stat. § 513.44(b), the badges of fraud the court may consider are:

Whether

(i) The transfer or obligation was to an insider;

(ii) The debtor retained possession or control of the property transferred after the transfer;

(iii) The transfer or obligation was disclosed or concealed;

(iv) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(v) The transfer was of substantially all the debtor's assets;

(vi) The debtor absconded;

(vii) The debtor removed or concealed assets;

(viii) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(ix) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(x) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(xi) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

The badges of fraud are also looked at in determining intent to hinder, delay, or defraud a creditor under 11 U.S.C. § 522(o). The presence of several or more badges of fraud establishes a presumption of fraudulent intent. *In re Northgate Computer Systems, Inc.*, 240 B.R. 328, 360-61 (Bankr. D. Minn. 1999) (citing *Kelly v. Armstrong*, 141 F.3d 799, 802 (8th Cir. 1998)). In the final analysis, the simple question "is whether [the debtor] is attempting to thwart his creditors rather than making an honest attempt to repay them." *Maronde*, 332 B.R. at 600 (citing *In re Mattson*, 241 B.R. 629, 637 (Bankr. D. Minn. 1999)).

Here, all but two of the applicable badges of fraud are present:

**(i)     The transfer or obligation was to an insider;**

The debtor transferred her nonexempt property to an insider, Mark Saliterman, her boyfriend of over five years at the time of the transfer.

**(ii)    The debtor retained possession or control of the property transferred after the transfer;**

While Mr. Saliterman retains the ultimate decision to repurchase the Birchwood Lane house, the debtor retains some semblance of control. Mr. Saliterman is her boyfriend and his exercise of the option to repurchase would result in the debtor receiving her initial $81,000 down payment, any monthly payments made, and half of the interest paid. This control would not exist if the debtor purchased the property from a stranger or purchased it from Mr. Saliterman without the option to repurchase.

**(iii)   The transfer or obligation was disclosed or concealed;**

The debtor concealed the true nature of her relationship with Mr. Saliterman from the trustee, referring to him as her "landlord" at the Section 341 meeting and failing to disclose the

8

relationship on schedule D as required. The trustee did not learn about the relationship until the debtor's deposition was taken several months after the Section 341 meeting.

**(iv)    Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;**

Before the transfer occurred, the SBA demanded payment and was beginning to garnish the debtor's wages.

**(v)    The transfer was of substantially all the debtor's assets;**

The debtor transferred virtually all of her non-exempt assets to Mr. Saliterman, leaving $4,834.54 available for distribution to her one unsecured creditor.

**(vi)    The debtor absconded;**

The debtor did not abscond. This badge off fraud is not present.

**(vii)    The debtor removed or concealed assets;**

The debtor removed nearly all of the funds from her savings account and used the funds as part of the down payment on the house. At the time she filed for bankruptcy, the debtor had $3,935 remaining in her bank accounts. Further, she also sold her only car, which was unencumbered and worth approximately $40,000, to one of Mr. Saliterman's car dealerships. The value of the car far exceeded what would be exempt under Minnesota law and the trustee could have sold it to obtain funds to pay the SBA, her sole unsecured creditor.

**(viii)    The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;**

The debtor received less than the reasonably equivalent value. Under the repurchase option, she cannot receive more than $301,500 for the house. She will receive no equity if the value of the house goes up. Further, Mr. Saliterman can exercise the option at any time while

9

owned by the debtor, including after the contract for deed is paid. On her schedules, the debtor lists three different values for the Birchwood Lane house. The current value of the property, without deducting the exemption, is $301,500 as listed on schedules A and C. The county valuation is $387,300 as listed on schedules A and C. The value of the claimed exemption is $390,000 as listed on schedule C. The debtor must believe the value of the property is $390,000, otherwise, she would not have claimed that amount exempt. Because of the option agreement and the value of the home evidenced by the debtor's exemption, the debtor received less than the reasonable equivalent value.

**(ix)    The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;**

The debtor became insolvent shortly after the transfer of property as she had no funds remaining in her savings and checking accounts and no other assets that were unencumbered or non-exempt.

**(x)    The transfer occurred shortly before or shortly after a substantial debt was incurred; and**

The debtor incurred the debt in 2006, which was six years before she purchased the house. This badge of fraud is not present.

**(xi)    The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.**

The debtor is not a business and did not transfer any essential assets of a business. This badge of fraud is not applicable to the debtor.

All but two of the applicable badges of fraud are evidenced in this case.

10

Because of the importance of the homestead exemption, the Eighth Circuit requires evidence of fraud that is extrinsic to the conversion of non-exempt assets into exempt assets, in addition to the badges of fraud, in order to disallow the homestead exemption. *Addison*, 540 F.3d at 812-13. In determining extrinsic evidence of intent, courts consider the extent of the conversion of the debtor's assets and the disclosure made by the debtor in the petition, schedules, and statements of financial affairs. *Sholdan v. Dietz (In re Sholdan)*, 217 F.3d 1006, 1010 (8th Cir. 2000).

Here, there a number of extrinsic circumstances demonstrating fraudulent intent or bad faith.

First, after the sale of the car and depleting her bank accounts, the debtor left $4,834.54 unencumbered or non-exempt to pay the SBA.[2]

The SBA is the debtor's sole unsecured creditor and she testified that she had no intention of paying them because she had guaranteed the loan for her nephew and did not receive the money. She paid all of her other bills on time.

The debtor was vague and nonresponsive in her testimony at trial. For example, when asked about Mr. Saliterman's business interests in Wayzata Nissan and Shakopee Chevrolet, she refused to answer at first, saying she "did not know." She then told the trustee's attorney that he should "ask [Mr. Saliterman]." The court finds that the debtor was not truthful. The couple has been together for six years. The debtor loaned $125,000 to one of Mr. Saliterman's dealerships, Wayzata Nissan.[3] She sold her car to Wayzata Nissan (although one of Mr. Saliterman's partners handled the sale). Immediately after selling her car, she began borrowing a car from

---

[2] The debtor had other exempt assets worth $202,183.25 as shown in schedule C.
[3] The bank records show that the debtor wrote a check in the amount of $125,000 for a "loan" to Wayzata Nissan on November 1, 2007, and was repaid on March 16, 2009.

11

Shakopee Chevrolet, another one of Mr. Saliterman's businesses. She knew about Mr. Saliterman's businesses and was not candid in her answers.

In the debtor's response to questions about the car she borrows from Shakopee Chevrolet, she testified that she is now paying for the loaner. The court doubts this is true as her schedules do not list any agreements regarding her use and payment for the car and, according to her schedule J, she is not paying car insurance. Under this arrangement, the debtor sold her car, exempted the proceeds from the sale, and is now using a different car for free.

Next, the debtor failed to disclose a number of items and was misleading in both her responses to the trustee's questioning and in filling out her petition and schedules. She failed to disclose her relationship with Mr. Saliterman as required on schedule D and at the Section 341 meeting. At the Section 341 meeting, the debtor mislead the trustee by calling Mr. Saliterman her "landlord." Her explanation at trial, that she did this because the trustee was talking about the house, was not credible. She failed to disclose loans and transfers to her nieces in her schedules. Her explanation, that she did not know what a "transfer" was, was also not believable. She has a degree in finance and has worked in the accounting and financial area for 20 years.

Another area of testimony from both the debtor and Mr. Saliterman that the court found unbelievable was about the debtor's renting of the Birchwood Lane House. The debtor testified that she and Mr. Saliterman considered the payments she made for the renovations, at the time she moved in, to be rental payments. The court is persuaded that this was not a lease of property. There was no rental agreement, no security deposit, no monthly rent payments, and no term. Mr. Saliterman did not report the alleged renovation repayments the debtor made to him on his tax returns as rent or otherwise. The renovation payments were not made according to the schedule,

if made at all.[4]  There is nothing in the promissory note that demonstrates a landlord-tenant relationship.  There was nothing to corroborate the debtor's or Mr. Saliterman's testimony.  While the debtor and Mr. Saliterman now say that her payments should be considered rent, there is no evidence to support a finding that the two parties considered the payments to be rental payments during the time she lived in the house before the sale.  This is another example of the debtor's failure to be candid with the court.

The trustee argues that the purchase of Mr. Saliterman's house was not an arms-length transaction.  The court agrees.  Mr. Saliterman is the debtor's boyfriend.  He financed the sale and created an option to repurchase.  He did not (1) use a realtor, (2) tell the debtor she would have to move out if she did not buy it, (3) get an appraisal to establish the price, or (4) negotiate a price with the debtor.  Under the option to repurchase, Mr. Saliterman can buy back the house at any time for a price not to exceed $301,500 (less the amount remaining on the contract for deed).  As part of the repurchase agreement, the debtor will receive back her down payment plus 50% of the interest paid to Mr. Saliterman.

The timing of the purchase is also suspect.  The debtor purchased the house for $301,500 from Mr. Saliterman slightly more than two months before filing her bankruptcy petition, but after receiving notice of the SBA demand and garnishment.  Mr. Saliterman testified that he came home from a trip to Texas and decided to sell the debtor.  The only reason he gave for wanting to sell the house was "[b]ecause she wanted to buy it."  This is hollow.  The only

---

[4] While the debtor and Mr. Saliterman testified that she made cash payments, there is no corroboration and the alleged amounts do not equal the amount owed under the note.  The debtor and Mr. Saliterman provided no testimony as to when the specific payments were made and for what amounts.  The sole evidence of payments in the record is the check for $45,000 from the debtor to Mr. Saliterman.

13

plausible reason for the sale was to transfer the debtor's non-exempt assets into exempt assets in order to avoid her SBA obligation when she filed bankruptcy two months later.

The court is convinced that the debtor intended to hinder, delay, and defraud her creditors. Once the SBA began collection efforts on the loans, the debtor took actions to conceal her assets from her sole unsecured creditor. The debtor placed her non-exempt assets into her boyfriend's house because she did she want to pay off the SBA loans.

While some exemption planning is acceptable and the mere conversion of non-exempt assets to exempt assets is not in itself fraudulent, a wholesale sheltering of assets that would go to creditors is not permissible.[5] Here, there was no testimony that there was any prepetition exemption planning. Rather, the debtor and her boyfriend undertook a scheme to put all of her assets out of the reach of her creditor. Here, the entire pattern of conduct surrounding the transfer of the nonexempt assets into exempt assets and the debtor's failure to be candid in her petition and her testimony proves that the debtor exhibited fraudulent intent. *See Nw. Bank Nebraska, N.A. v. Tveten*, 848 F.2d 871, 876 (8th Cir. 1988).

## CONCLUSION

The application of the badges of fraud, together with the extrinsic circumstances of the transaction, leads to the conclusion that the purchase of the Birchwood Lane house, including the conversion of the car and bank account in to the down payment for an exempt asset, was done with the intent to defraud the debtor's sole unsecured creditor. The court finds that the debtor violated Minnesota's Uniform Fraudulent Transfer Act and 11 U.S.C. § 522(o). Therefore, the trustee has met her burden of proof and the objection to the debtor's homestead exemption is sustained.

---

[5] *Sholdan*, 217 F.3d at 1010 (citing *Hanson v. First Nat'l Bank*, 848 F.2d 866, 868 (8th Cir. 1988)); *In re Bronk*, 444 B.R. 902, 908 (Bankr. W.D. Wis. 2011).

**IT IS ORDERED:**

The trustee's objection to the debtor's exemption is **SUSTAINED**.

/e/ Kathleen H. Sanberg
Kathleen H. Sanberg
United States Bankruptcy Judge